# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 12, 2005          Decided June 24, 2005

No. 04-1367

KATHY A. MORALL, M.D.,
PETITIONER

v.

DRUG ENFORCEMENT ADMINISTRATION,
RESPONDENT

---

On Petition for Review of an Order of the
United States Drug Enforcement Administration

---

*Joseph M. Hannon, Jr.* argued the cause for petitioner. With him on the briefs was *Robert N. Spencer*.

*Teresa A. Wallbaum*, Senior Trial Attorney, U.S. Department of Justice, argued the cause and filed the brief for respondent.

Before: EDWARDS, HENDERSON, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

Opinion filed by *Circuit Judge* HENDERSON, concurring in the judgment.

EDWARDS, *Circuit Judge*: Kathy A. Morall, M.D. petitions this court to review the Drug Enforcement Administration's ("DEA") decision to revoke her certificate of registration. On

September 28, 2001, DEA issued an Order to Show Cause to Dr. Morall, proposing to revoke her DEA registration, which authorizes the dispensing of controlled substances, on the grounds that, *inter alia*, she had failed to maintain complete and accurate records of controlled substances. In June 2002, a hearing on these charges was held before an Administrative Law Judge ("ALJ"). After hearing testimony from Dr. Morall, Dr. Greenfield and Dr. Teich, who testified on behalf of Dr. Morall, and DEA Investigator Barnhill, the ALJ concluded "that a preponderance of the evidence [did] not establish that it would be inconsistent with the public interest to continue [Dr. Morall's] DEA registration." *Opinion and Recommended Ruling, Findings of Fact, Conclusions of Law and Decision of the ALJ* (Apr. 28, 2003) ("*ALJ Decision*") at 20, *reprinted in* App. tab B.

The ALJ made a number of credibility findings in Dr. Morall's favor and also noted that "[t]he Colorado Board of Medical Examiners [had] reviewed the DEA report of investigation but determined to take no disciplinary action against [Dr. Morall], and thus she is fully licensed in Colorado." *Id*. at 18. In sum, the ALJ found that, although Dr. Morall's violations of DEA record-keeping regulations were egregious, the violations "occurred over a fairly short period of time," Dr. Morall "appeared to regret" her errors, and "the record does not establish that [Dr. Morall] diverted any controlled substances." *Id*. at 20. The ALJ thus recommended that no action be taken against Dr. Morall. DEA filed no exceptions to the ALJ's decision.

Over a year later, the Deputy Administrator declined to adopt the ALJ's proposed findings of fact and law and revoked Dr. Morall's registration. The Deputy Administrator acknowledged that the record-keeping failures alone might not warrant revocation in light of compelling, extenuating circumstances in Dr. Morall's personal life. *Kathy A. Morall,*

*M.D., Revocation of Registration*, 69 Fed. Reg. 59,956, 59,960 (Oct. 6, 2004). The Deputy Administrator determined, however, that Dr. Morall's registration should be revoked because "she lied to the investigators on numerous occasions." *Id.* The Deputy Administrator thus concluded that "[i]f [Dr. Morall's] only failures involved record-keeping, the Deputy Administrator might find it appropriate to impose a lesser sanction than revocation . . . . [Dr. Morall's] false and misleading statements, however, cannot be excused." *Id*.

In reaching this judgment, the Deputy Administrator relied almost exclusively on the testimony of the DEA Investigator, almost as if no other testimony or evidence was in the record. The Deputy Administrator's decision takes no account whatsoever of the ALJ's credibility findings, completely ignores the testimony of Dr. Greenfield and of Dr. Teich, and substantially fails to acknowledge the testimony given by Dr. Morall that explains or disputes the DEA Investigator's claims. The agency decision is, in short, stunningly one-sided in its focus and, thus, utterly arbitrary and capricious.

We hold that DEA's decision cannot withstand review, because it fails to consider contradictory record evidence where such evidence is precisely on point. Such a lapse of reasonable and fair decisionmaking is particularly acute where, as here, the decision entirely ignores the ALJ's credibility findings. Furthermore, DEA has failed to explain its departure from prior cases that have consistently declined to revoke a physician's registration in comparable circumstances and also in situations involving much more serious conduct. Therefore, even if DEA's decision were adequately supported, the penalty imposed would be unwarranted by law. Accordingly, we vacate the revocation of Dr. Morall's registration.

## I. BACKGROUND

### A. *Factual Background*

Kathy A. Morall, M.D. is a Colorado-licensed physician who, until the revocation of her DEA registration, was practicing psychiatry at the Jefferson Center for Mental Health ("Jefferson Center"). Dr. Morall, a graduate of Howard University School of Medicine, had practiced general and forensic psychiatry for over twenty years, and had qualified as an expert in both state and federal court.

In July 1997, Dr. Morall went to work for Joshua Holland, M.D. as a physician at the Holland Center for Family Health ("Holland clinic"), a weight-loss clinic located at 128 Steele Street, Suite 200, in Denver, Colorado. Dr. Holland resided in Phoenix, Arizona. Dr. Morall testified that she decided to work in a weight-loss clinic because obesity, "the number one health problem in the country," is "predominantly associated with psychological issues" and "has a domino effect on so many parts of one's life." Tr. of Proceedings Before the ALJ ("Tr.") at 292, *reprinted in* App. tab F. The Holland clinic focused on the "phen-fen" treatment, which combined phentermine and Pondimin, a brand name product containing fenfluramine hydrochloride.

The circumstances giving rise to this case occurred after the closure of the Holland clinic. This period was marked by a series of unfortunate events for Dr. Morall. She testified that she had begun to experience severe headaches, weight gain, high blood pressure, fatigue, hair loss, and depression, and that she was eventually diagnosed with a disorder created by an increase in hormones from the pituitary gland. During this same time period, Dr. Morall's father died of a brain tumor and she thought that she might have a brain tumor as well; her son had a seizure and was diagnosed with an illness similar to sickle cell anemia; and several close friends passed away, including one who

committed suicide. One of the close friends who passed away was Mr. Carl Ousley, who Dr. Morall described as akin to a member of her family. Dr. Morall also explained that she had no support staff to assist her in her practice during most of the period after the closure of the Holland clinic.

### 1. *Closure of the Holland Clinic*

On September 15, 1997, Pondimin was withdrawn from the market after it was linked to a heart valve disorder and to a heart and lung disorder. According to Dr. Morall, in the wake of Pondimin's withdrawal, the Holland clinic suffered serious financial losses, and she and Dr. Holland discussed ways to maintain the clinic as a viable operation. Dr. Holland ultimately resolved to provide permanent cosmetics at the clinic, a decision with which Dr. Morall strongly disagreed. She believed it would be "[o]ffensive to [the] clients . . . [who] came with serious weight problems who are now afraid that they may have a medical problem, problems with their heart, and our response was going to be but, by the way, do you want permanent makeup?" Tr. at 306. Dr. Holland nevertheless sent a letter, which included Dr. Morall's name, to all clinic patients informing them that permanent makeup would be offered. According to Dr. Morall, at this point her relationship with Dr. Holland began to deteriorate.

On Friday, November 7, 1997, Dr. Morall underwent minor surgery. She testified that while she was still at the hospital, the clinic office manager paged her to inform her that Dr. Holland had closed the clinic that day and instructed the locks to be changed. Dr. Morall stated that she went directly from the hospital to the Holland clinic and called the "medical board" to inquire about directives for closing a practice. She also wanted to notify the clinic's patients that, come Monday, they would not be able to reach anyone at the clinic number or address. That same day, she moved all of her possessions from the Holland clinic to Suite 202 in the same building and resolved to open her

own practice where she could continue to treat patients with weight issues.

2. *Dr. Morall's Relocation of Her Practice*

In November 1998, Dr. Morall was evicted from her own practice in Suite 202 of the Steele Street building for failure to pay rent. At this point, Dr. Morall moved her practice to an office in her home. She testified that she "took care of patients from [her] home," but did not see them there, explaining that she maintained established patients, whom she only needed to see at three-month intervals, on weight-loss medication, and that she hoped to move back to another office location within the three-month time period. *See* Tr. at 351.

Dr. Morall testified that after she moved her practice to her home, her drug distributor notified her that controlled substances could only be delivered to her home if it was her DEA registered address. Accordingly, Dr. Morall called DEA to request that her registered location be changed from the Steele Street address to her home address. Dr. Morall spoke with Ms. Betty Garcia, a DEA registration technician.

According to a memorandum prepared by Ms. Garcia, Dr. Morall had informed Ms. Garcia that she saw patients at her home and that she had a safe there to store controlled substances. Dr. Morall disputes this account of her November 12, 1998 phone conversation with Ms. Garcia. She testified that she did not tell Ms. Garcia that she was "seeing" patients at her home: "I think I said I was taking care of patients in my home." Tr. at 354. She also attested to telling Ms. Garcia that she had a "safe place" to store controlled substances, rather than a safe. Dr. Morall maintained that "I can't imagine my calling up and saying I want the meds transferred, by the way, I have a safe. There would be no reason . . . [because] there was no requirement for a safe," and there was never a safe in the prior places where she had worked, including her practice at Suite 202

or at the Holland clinic. *Id*. On November 12, 1998, Dr. Morall's DEA registration was modified to reflect her home address. The request to have controlled substances delivered to her home triggered a DEA investigation.

Following the modification of her DEA registration to her home address, Dr. Morall ordered a shipment of 3,000 dosage units of phentermine and 200 dosage units of Meridia to that address.

### 3. *DEA's Investigation of Dr. Morall*

On December 1, 1998, Investigator Lisa Barnhill and Task Force Officer John Gray went to Dr. Morall's residence. Investigator Barnhill testified that Dr. Morall initially denied having any controlled substances at her home and only acknowledged their existence when specifically asked about the recent shipment. When Dr. Morall retrieved the controlled substances, they were in a box on the floor of a closet. The box, which also contained open bottles, loose pills, and trash, did not comport with DEA requirements that drugs be stored in a locked and substantially constructed cabinet.

Dr. Morall did not recall initially denying the existence of controlled substances in her home and noted that there was no reason for her to deny it as she had called DEA to change her registration address in order to have them there.

Also during the December 1 inspection, the investigators requested that Dr. Morall provide them with records of her handling of controlled substances. According to Investigator Barnhill, Dr. Morall told her that she was in the process of moving her practice from the Steele Street location and that her records were still at that location, but agreed to provide them the next day. On December 3, Dr. Morall left a voice mail message for Investigator Barnhill saying the records were in the mail. On December 4, she left a second message saying she wanted to speak with an attorney before sending them. Dr. Morall testified

to changing her mind on the way to the post office, because she was not sure whether providing the records could violate any privacy obligations she owed her patients.

On December 21, 1998, Dr. Morall sent some copies of records to Investigator Barnhill. They appeared to have been reconstructed rather than contemporaneous; they were incomplete and inaccurate and they did not conform to Investigator Barnhill's specifications in a number of ways. Dr. Morall testified that the documents she sent to Investigator Barnhill on December 21 were an attempt to reconstruct records from memory and some contemporaneous notes. She asserted that she knew the records were incomplete and that the documents were not contemporaneous with her dispensing of the drugs, and that she had not intended to represent otherwise.

According to Investigator Barnhill, the investigators requested the originals of the reconstructed documents but received no response from Dr. Morall. On January 5, 1999, having obtained an administrative subpoena to inspect Dr. Morall's home, Investigator Barnhill and others executed the warrant. They found Dr. Morall's records intermingled with personal papers, financial data, and other such documents, as well as a notepad on which Dr. Morall had apparently tried to reconcile the quantities of drugs given to patients.

Investigators also found a vial of phentermine belonging to a patient named Carl Ousley that identified Dr. Morall as the prescribing physician. According to Investigator Barnhill, when Dr. Morall was asked the identity of Mr. Ousley, she answered that he was her uncle, while Dr. Morall's husband said that Ousley was a friend. Dr. Morall testified that she had referred to Ousley as "Uncle Carl," because that is what her family called him as he had been "like a family member for 20 years" joining the family on trips and family reunions. Tr. at 374.

Investigators also found an empty manufacturer's 100-count bottle of phentermine, as well as other empty prescription vials in different locations in Dr. Morall's home. Dr. Morall told the investigators that she had dispensed the medications to her patients, but she was unable to provide the documentation to support this assertion. Investigators also found the empty bottles of Meridia and three open bottles of phentermine that Dr. Morall showed them during the December 1 visit; they were in a file cabinet in the closet, which had a lock, but the key was in the key hole. Investigators counted 542 tablets of phetermine 15 mg on January 5, compared to an earlier count of 735 tablets on December 1.

According to Investigator Barnhill, Dr. Morall informed her that she had not dispensed from her home since the investigators' December 1 visit. Dr. Morall, however, testified that she had actually told Investigator Barnhill that she had not dispensed from the Steele Street address since that time. Indeed, the records that Dr. Morall supplied to Investigator Barnhill on December 21 had indicated that she provided phentermine to patients after December 1. It is undisputed that, as of the January 5 inspection, Dr. Morall had not informed Investigator Barnhill that she had been evicted from the Steele Street location. Dr. Morall testified that she "was embarrassed" by the situation and "didn't want to say that if [she] didn't have to," because she thought she "would be able to work something out to get back in." Tr. at 363.

In the course of the January 5 inspection, investigators asked Dr. Morall if she had ever taken phentermine herself. She testified that when she began working at the Holland clinic, Dr. Holland had written her a prescription and suggested that she try it. She never used the prescription and did not try the medication until she gained weight related to her illness. At that point, she received a prescription from a physician who was a friend and tried the medication, but "[i]t didn't work. . . . [She]

had too many complicated problems going on at the time . . . ." Tr. at 343. She asserted that she never tried it "for any reason other than to address [her] symptom of weight gain," *id.*, and she did not take phentermine from the bottles and vials found in her home.

In the course of their investigation of Dr. Morall, the investigators also learned of a theft at the Holland clinic, in July 1997, which had not been properly reported to DEA. Investigator Barnhill initially asserted that the drugs in the Holland clinic had been ordered under Dr. Morall's DEA registration number and that Dr. Morall was therefore responsible for reporting the theft. Investigator Barnhill conceded on cross-examination, however, that she had no evidence that Dr. Morall ordered the medications that were stolen and that she had no evidence that Dr. Morall ordered controlled substances prior to November 25, 1997, which was after the Holland clinic had closed. Investigator Barnhill admitted that she just "assume[d]" that Dr. Morall had ordered the drugs, because she had been registered at that location, though she did not know whether Dr. Holland was also registered there. Tr. at 191. Moreover, it is undisputed that Dr. Morall reported the theft to the police.

Dr. Morall maintained that she did not order medications for the Holland clinic and that Dr. Holland's assistant in Phoenix ordered medications for both his Denver and Phoenix clinics. She also testified that when she learned of the theft, she called Dr. Holland and the "medical board" and that someone at the board gave her a toll-free number to call DEA, which she did.

Investigator Barnhill also suggested that Dr. Morall was responsible for failing to document a return of controlled substances. She asserted that the investigators learned of an instance in which Dr. Morall did not document a return, in May 1998, of drugs that had been recalled. Dr. Morall maintained that Dr. Holland had ordered the particular drugs, which were no

longer available as of November 1997, and that she had not heard that they had been returned under her registration number until the day of the hearing. She noted that when she moved from Suite 200 to Suite 202 in the Steele Street building, the remaining medications in the Holland clinic were locked in a room inside Suite 200, which she could not access.

As to Suite 202, Investigator Barnhill testified that Dr. Morall agreed to allow investigators to inspect that location, but that, despite numerous calls and conversations, they were not able to arrange a specific date. Dr. Morall acknowledged that investigators called her to arrange a visit to the Steele Street location, and explained that she discussed the calls with her attorney at the time, who instructed her that all contacts should be through him. Investigator Barnhill admitted that Dr. Morall's attorney had contacted her to inform her that he was representing Dr. Morall, but stated that she did not try to contact him because "[h]e made no statements that he did not want [investigators] to talk to [Dr. Morall] directly." Tr. at 217.

Investigator Barnhill admitted that she *was* told, in writing, by Dr. Morall, to contact her attorney prior to contacting any of her patients, but Investigator Barnhill conceded that she did not do so when she attempted to call a few patients in the course of her investigation.

Investigators ultimately obtained a search warrant for Suite 202 of the Steele Street building and executed that warrant on May 6, 1999. Investigator Barnhill testified that the premises were in disarray. There were records that were not current and did not meet DEA requirements. The investigators also found a wheeled plastic cart with no locking device that contained controlled substances.

Dr. Morall explained that she had kept controlled substances in a locked filing cabinet in Suite 202 and, each day, placed medications that she intended to provide to patients that

day on the plastic cart. She further asserted that the day she was evicted from the Steele Street office, she was in the process of moving her possessions out of the office when the building manager saw her and locked her out. Consequently, she had no opportunity to secure the medications that she had previously placed on the cart.

One item seized from Suite 202 was a price list of certain controlled substances for weight loss. Based solely on this price list, Investigator Barnhill testified that "it looked to [her] like [Dr. Morall] was just pretty much pushing drugs." Tr. at 111. On cross-examination, however, Investigator Barnhill admitted that the name of the clinic at the top of the price list was actually Dr. Holland's clinic, not "Total Health Care Systems," the name that Dr. Morall gave her own practice in Suite 202. She also admitted that she did not know of any patient who was ever given the price list, at least by Dr. Morall.

DEA performed a number of accountability audits of Dr. Morall, which reflected various shortages and/or overages of the drugs. One particular audit covering the time period from November 25, 1997 to January 5, 1999 and incorporating the records seized at the Steele Street location revealed shortages of thousands of dosage units of controlled substances. Dr. Morall maintained that she had dispensed the drugs to her patients, but she lacked the documentation to support this assertion.

Investigator Barnhill admitted on cross-examination, however, that, if Dr. Morall was correct in her testimony that she was treating seventeen patients during that time and prescribing a regiment of about two pills per day, the number of unaccounted-for medications could easily be accounted for by such legitimate dispensing. Investigator Barnhill also admitted that she did not attempt to check if Dr. Morall's patients had received the medications. She and her partner tried to contact "just very few" of the patients and only actually spoke to one patient, who did not deny that he and his wife were both patients

of Dr. Morall or that they had received medication from her. Tr. at 181-82.

Following completion of the investigation of Dr. Morall, Investigator Barnhill provided a copy of her report to the Colorado Board of Medical Examiners ("Medical Board"). It is undisputed that the Medical Board elected to take no action against Dr. Morall.

At the hearing before the ALJ, Dr. Morall fully acknowledged that her record keeping was "abysmal" after the closure of the Holland clinic. Tr. at 330-31. In light of the stressful events transpiring in her life at the time – her father's death, her son's illness, her own health problems, including depression, and the deaths of several close friends – Dr. Morall described her personal state during the relevant time period: "I would spend hours sitting in my office, and I wasn't doing anything, I was just sitting, and I took notes always with the intention of transferring information to the charts, but I never did. I had boxes from my office in between the living room and the dining room that I needed to sort through. I couldn't do it. I really was not able to do much of anything, and it wasn't like me." Tr. at 347-48.

Stephen Teich, M.D. testified at the hearing that he is a psychiatrist who has known Dr. Morall since the late 1980s and that he considered himself her friend as well as her colleague. He amplified the consuming events in Dr. Morall's life during the time period in question. Dr. Teich also asserted that he considered Dr. Morall an "excellent psychiatrist" who handled medications "at least as well as most everybody I've seen, if not better." Tr. at 260. Dr. Teich thought "it would be a great limitation on her ability to work and a loss to the patient population she deals with if she were not able to prescribe . . . ." *Id*. When asked about Dr. Morall's risk to abuse or divert controlled substances, he underscored that he could not imagine such a possibility. Indeed, there is absolutely no evidence in the

record of substance abuse by Dr. Morall or her family. Investigator Barnhill explicitly admitted on cross-examination that she had received no reports of diversion or abuse pertaining to Dr. Morall, there was no evidence that Dr. Morall ever abused phentermine, and there was no indication that any patient of Dr. Morall ever received phentermine for other than a legitimate medical purpose.

According to Dr. Morall, as of the date of her hearing, she had been working as a staff psychiatrist for the Jefferson Center, a mental health center providing care for low-income and indigent clients, for two and a half years. She also submitted into evidence an affidavit by Holly Greenfield, M.D., a psychiatrist and, between 1995 and 2001, Medical Director of the Jefferson Center. Dr. Greenfield stated that she had hired Dr. Morall at the Jefferson Center and served as her immediate supervisor. According to Dr. Greenfield, Dr. Morall was "an exceptionally competent and compassionate psychiatrist" and a "tremendous asset to the [Jefferson] Center." Aff. of Holly Greenfield, M.D. at 2-3, *reprinted in* App. tab H. Dr. Greenfield also stated that she "never had any reason to suspect that Dr. Morall in any way abused or diverted any controlled substance," and she "found no problems with her documentation of [their] use." *Id*. at 3. According to Dr. Greenfield, Dr. Morall was "too good of a psychiatrist and too much of an asset to Jefferson Center and its patients" to lose her registration. *Id*. at 4.

Dr. Morall stated unequivocally that she would take a course in record keeping for controlled substances in order to maintain her DEA registration; indeed, she "[thought] it would be appropriate." Tr. at 453.

**B.** *Statutory and Regulatory Background*

The Controlled Substances Act ("Act"), as amended, requires persons who dispense controlled substances to obtain proper registration from the Attorney General. *See* 21 U.S.C. §

822(a)(2) (2000). The authority to deny, revoke, or suspend registrations has been delegated to the Administrator of DEA, *see* 21 U.S.C. § 824 (2000), 28 C.F.R. § 0.100(b) (2004), and redelegated to the Deputy Administrator, *see* 28 C.F.R. § 0.104 & App. § 12 (2004).

The Act authorizes suspension or revocation of a certificate of registration where the registrant "has committed such acts as would render his registration under section 823 of this title inconsistent with the public interest . . . ." 21 U.S.C. § 824(a)(4). Section 823(f) provides the factors to be considered "[i]n determining the public interest":

(1) The recommendation of the appropriate State licensing board or professional disciplinary authority.

(2) The applicant's experience in dispensing, or conducting research with respect to controlled substances.

(3) The applicant's conviction record under Federal or State laws relating to the manufacture, distribution, or dispensing of controlled substances.

(4) Compliance with applicable State, Federal, or local laws relating to controlled substances.

(5) Such other conduct which may threaten the public health and safety.

21 U.S.C. § 823(f) (2000). The Administrator is not required to "make findings as to all of the factors enumerated . . . . Rather, he may give each factor the weight he deems appropriate." *Henry J. Schwarz, Jr., M.D., Denial of Application*, 54 Fed. Reg. 16,422, 16,424 (Apr. 24, 1989). DEA bears the initial burden of proving that registration is not in the public interest; the burden of production then shifts to the would-be registrant to rebut the evidence. *See Humphreys v. DEA*, 96 F.3d 658, 661 (3d Cir. 1996) (citing *Shatz v. United States Dep't of Justice*, 873 F.2d 1089, 1091 (8th Cir. 1989)).

Registrants dispensing controlled substances must comply with a number of statutory and regulatory requirements. As relevant here, they must maintain inventories and other records pursuant to 21 U.S.C. § 827(a)(1) (2000). They are also required to hold a DEA registration at any location where they dispense controlled substances, *see* 21 C.F.R. § 1301.12 (2004), and to store controlled substances "in a securely locked, substantially constructed cabinet," *id*. § 1301.75. Finally, physicians who provide controlled substances directly to patients must maintain written records of such dispensing covering a minimum of two years; take an initial inventory of all controlled substances on hand and biennial inventories thereafter; and maintain records of receipts, dispensings, and transfers of controlled substances. *See id*. §§ 1304.03(b), 1304.04, 1304.11, 1304.21.

## C. *DEA's Decision*

On September 28, 2001, the Deputy Assistant Administrator, Office of Diversion Control, DEA, issued an Order to Show Cause to Dr. Morall, proposing to revoke her DEA certificate of registration and deny any pending applications for renewal on the ground that such registration would be inconsistent with the public interest pursuant to 21 U.S.C. §§ 823(f), 824(a)(4). Dr. Morall requested a hearing, which took place before the ALJ in June 2002. At the hearing, Dr. Morall and Dr. Teich testified on Dr. Morall's behalf; Dr. Greenfield's testimony was also submitted by way of affidavit. Investigator Barnhill was DEA's sole witness.

On April 28, 2003, the ALJ issued proposed findings of fact and conclusions of law. She considered each of the factors provided at 21 U.S.C. § 823(f). The ALJ found that factor one – recommendation of state licensing board – weighed in Dr. Morall's favor, because the Colorado Board of Medical Examiners reviewed the DEA report of the investigation but decided to take no disciplinary action against Dr. Morall.

Similarly, factor three – convictions related to controlled substances – weighed in Dr. Morall's favor as the record did not indicate that Dr. Morall had ever been convicted of a state or federal violation pertaining to controlled substances.

Under factor two – experience in handling controlled substances – the ALJ considered DEA's arguments that Dr. Morall neglected an obligation to report the theft of controlled substances from the Holland clinic; that she failed to report the return of controlled substances to the supplier; that she dispensed controlled substances from her home prior to being registered there; that she did not properly store controlled substances at either her Steele Street or home location; and that she failed to take an initial inventory and maintain appropriate records.

The ALJ specifically credited Dr. Morall's testimony that she was not responsible for ordering controlled substances when she worked at the Holland clinic; that she reported the theft to the police, the Medical Board, and DEA; that she had not ordered the drugs that were returned under her DEA registration number and did not know that they were returned under her number; that she did not have the opportunity to secure the drugs she intended to dispense on the day that she was evicted from her Steele Street office; and that she had told Ms. Garcia that she was taking care of patients from her home, but did not say she saw them there. The ALJ therefore concluded that DEA did not establish by a preponderance of the evidence that Dr. Morall failed to secure controlled substances at the Steele Street location, failed to report a theft, dispensed controlled substances from her home without being registered there, or failed to keep records of a return.

Because it was undisputed, however, that Dr. Morall did not take inventories, maintain proper records, or properly store drugs at her home, the ALJ determined that factor two weighed

against Dr. Morall. For the same reason, the ALJ concluded that factor four also weighed against Dr. Morall.

Under factor five, the ALJ found that Dr. Morall had not engaged in any other conduct that could threaten the public health or safety.

The ALJ concluded that, although Dr. Morall's record-keeping violations were egregious, "they occurred over a fairly short period of time and the record does not establish that [Dr. Morall] diverted any controlled substances. In addition, [Dr. Morall] appeared to regret her past conduct and I find that she is unlikely to repeat it." *ALJ Decision* at 20. Thus, the ALJ recommended that Dr. Morall's registration not be revoked, because "a preponderance of the evidence does not establish that it would be inconsistent with the public interest to continue [Dr. Morall's] DEA registration." *Id*.

Although counsel for DEA was granted an extension of time to file exceptions to the ALJ's decision, no exceptions were filed. The ALJ transmitted the record of proceedings to the Deputy Administrator on July 14, 2003.

Over a year later, on September 16, 2004, counsel for Dr. Morall sent a letter complaint to the Office of the Inspector General, stating that while the ALJ's decision "was very favorable to [Dr. Morall], the DEA's delay in confirming that decision has imposed *de facto* punishment upon her," because no new registration could issue. Letter from Robert N. Spencer to Civil Rights & Civil Liberties Complaints, Office of the Inspector General of 9/16/04 at 1, *reprinted in* App. tab D. Counsel for Dr. Morall explained that "[n]eedless to say, this is creating havoc for my client with her employer and her health care insurance panels, which require proof of current DEA registration. At this point, I can only believe the DEA's inexcusable delay in acting upon Dr. Morall's case is intentional . . . ." *Id.*

Less than two weeks after the letter was sent to her, the Deputy Administrator served Dr. Morall with a final order revoking Dr. Morall's certificate of registration. The Deputy Administrator declined to adopt the ALJ's opinion and recommended rulings, findings of fact, conclusions of law, and decision.

After findings of fact that largely traced Investigator Barnhill's testimony and entirely ignored Dr. Morall's on numerous disputed facts, the Deputy Administrator determined that only factors two, four, and five were pertinent to the legal question whether Dr. Morall's registration was inconsistent with the public interest. With regard to factors two and four, the Deputy Administrator found that Dr. Morall had committed serious record-keeping violations. The Deputy Administrator concluded, however, that Dr. Morall's record-keeping failures might be partly excused by the extremely stressful circumstances in her life during this time period. Thus, the balance of her decision focused on factor five.

Under factor five, the Deputy Administrator was "particularly disturbed . . . by the numerous occasions that [Dr. Morall] provided false information to DEA investigators and repeatedly frustrated their attempts to conduct their investigation." 69 Fed. Reg. at 59,960. Although Dr. Morall had testified that she "never meant to mislead the investigators and denied making false statements," the Deputy Administrator found that Dr. Morall "has no credibility, because it is absolutely clear that she lied to the investigators on numerous occasions." *Id*.

Specifically, the Deputy Administrator concluded that

[Dr. Morall] lied about possessing controlled substances at her house. She lied about having a safe in her house in which to store controlled substances. She lied about treating patients from her home. She lied about the true

identity of a friend for whom she had written prescriptions for controlled substances. She misled the investigators about the existence of patient records. She continually maintained that she had controlled substance records at her office, when in truth she did not. She later admitted that she had tried to create the records from memory. . . .

Moreover, [Dr. Morall] agreed to assist DEA investigators in their inspection of the Steele Street location, without telling them that she had been evicted from that location. . . . [She] also made false statements regarding the transfer of drugs.

*Id*.

The Deputy Administrator also pointed to Dr. Morall's inability to account for many of the controlled substances under her care, and stressed that while Dr. Morall "asserted that the controlled substances were legitimately dispensed to patients, she had no records to support her assertion." *Id*. The Deputy Administrator stated that, although she did "not necessarily find that [the] controlled substances were diverted," *id.*, circumstantial evidence suggested that Dr. Morall or someone close to her might be abusing controlled substances in Dr. Morall's possession.

The Deputy Administrator ordered Dr. Morall's DEA registration revoked, explaining that "[i]f [Dr. Morall's] only failures involved record-keeping, the Deputy Administrator might find it appropriate to impose a lesser sanction than revocation of [her] DEA registration. [Dr. Morall's] false and misleading statements, however, cannot be excused." *Id*.

## II. ANALYSIS

### A. *Standard of Review*

We review DEA's factfinding for substantial evidence. *See* 21 U.S.C. § 877 (2000). Substantial evidence "means evidence

which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 299-300 (1939) (internal citations omitted).

In applying the substantial evidence test, we have recognized that an agency decision "may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Robinson v. Nat'l Transp. Safety Bd.*, 28 F.3d 210, 215 (D.C. Cir. 1994) (internal quotation marks omitted). Our function is to determine "whether the agency . . . could fairly and reasonably find the facts that it did." *Id.* (internal quotation marks omitted). However, the court "may not find substantial evidence 'merely on the basis of evidence which in and of itself justified [the agency's decision], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 962 (D.C. Cir. 2003) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 456, 487 (1951)). And, while the agency is the ultimate factfinder, the ALJ's "decision is part of the record, and the record must be considered as a whole in order to see whether the result is supported by substantial evidence. The agency's departures from the [ALJ's] findings are vulnerable if they fail to reflect attentive consideration to the [ALJ's] decision." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 853 (D.C. Cir. 1970) (footnotes omitted).

Although 21 U.S.C. § 877 does not specify a standard for reviewing the agency's reasoning as distinguished from its factfinding, "the APA provides the appropriate default standard: A court must set aside agency action it finds to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Tourus Records, Inc. v. DEA*, 259 F.3d

731, 736 (D.C. Cir. 2001) (quoting 5 U.S.C. § 706(2)(A) (2000)). "[A]n agency [decision is] arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

To uphold DEA's decision, then, we must satisfy ourselves "that the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *El Rio Santa Cruz Neighborhood Health Ctr. v. United States Dep't of Health & Human Servs.*, 396 F.3d 1265, 1276 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43) (internal quotation marks omitted) (alterations in original). Applying these standards, we conclude that DEA's decision cannot withstand review.

**B. *DEA's Decision To Revoke Dr. Morall's Registration***

The Deputy Administrator's decision to order the harshest of possible sanctions – revocation – turned primarily on her determination that the record revealed evidence of "other conduct which may threaten the public health and safety." 21 U.S.C. § 823(f)(5). She determined that if Dr. Morall's "only failures involved record-keeping, the Deputy Administrator might find it appropriate to impose a lesser sanction than revocation of [Dr. Morall's] DEA registration." 69 Fed. Reg. at 59,960. The extenuating circumstances to which the Deputy Administrator alluded included Dr. Morall's physical health problems involving her pituitary gland (which led her to believe that she might have to undergo brain surgery), her son's seizure and ultimate diagnosis of a disease related to sickle cell anemia, the deaths of several of her friends (including one by suicide),

and her own serious depression during the relevant time period. *See id.*

The Deputy Administrator's overarching finding under factor five was that Dr. Morall is a liar. While Dr. Morall had testified that she "never meant to mislead the investigators and denied making false statements," *id.*, the Deputy Administrator found that Dr. Morall "has no credibility, because it is absolutely clear that she lied to the investigators on numerous occasions," *id.* The Deputy Administrator found that these "lies" obliterate Dr. Morall's credibility, reflect a failure to cooperate with investigators, and justify terminating the physician's capacity to prescribe and dispense controlled substances. *Id.*

There is no doubt that Dr. Morall was not as forthcoming as she might have been. This is very different, however, from characterizing Dr. Morall as a willful liar, a conclusion that simply does not emanate from the record before us. That said, it is not our job to evaluate Dr. Morall's credibility. Rather, our job is to determine whether the conclusions drawn by the Deputy Administrator follow from a fair and reasonable review of the relevant evidence.

Our lodestar is the question whether the record *as a whole* provides substantial evidence to support the agency action. We conclude that it does not, because the decision of the Deputy Administrator gives no indication whatsoever that the decision maker considered *any* of Dr. Morall's testimony bearing directly on each of the purported "lies." To be clear, DEA's decision does not withstand review because the agency decisionmaker *entirely ignored* relevant evidence. *See El Rio Santa Cruz Neighborhood Health Ctr.*, 396 F.3d at 1278 (finding agency action arbitrary and capricious in failing to address relevant evidence before it); *Robinson*, 28 F.3d at 216 (agency may not ignore testimony bearing on critical fact in case); *Lakeland Bus Lines*, 347 F.3d at 962 (court cannot find substantial evidence

solely on the basis of evidence that supports the result, without considering contradictory evidence).

The Deputy Administrator concluded that

[Dr. Morall] lied about possessing controlled substances at her house. She lied about having a safe in her house in which to store controlled substances. She lied about treating patients from her home. She lied about the true identity of a friend for whom she had written prescriptions for controlled substances. She misled the investigators about the existence of patient records. She continually maintained that she had controlled substance records at her office, when in truth she did not. She later admitted that she had tried to create the records from memory. . . .

. . . [She] also made false statements regarding the transfer of drugs.

69 Fed. Reg. at 59,960.

As indicated above, Dr. Morall presented extensive testimony pertaining to each of these disputed facts, though one would not know it from the Deputy Administrator's analysis. We will consider here just a few examples of the testimony that the Deputy Administrator ignored. It is particularly troubling that the Deputy Administrator does not appear to have considered testimony by Dr. Morall *that the ALJ credited*. The ALJ expressly credited Dr. Morall's testimony that she told Ms. Garcia that she was taking care of patients from her home, but did not say that she saw them there. *See ALJ Decision* at 18. The Deputy Administrator gave no indication that she considered Dr. Morall's testimony, nor any reason for rejecting the ALJ's decision to credit Dr. Morall's account, when she made the conclusory finding that Dr. Morall "lied about treating patients from her home."

The ALJ also credited Dr. Morall's account "that she did not order the drugs that were returned using her DEA registration number and did not know they were returned under her number." *ALJ Decision* at 18. Dr. Morall had testified at length that at the time that the recalled drugs could have been ordered – *i.e.*, when they were still on the market – she was an employee of Dr. Holland's, and that her understanding was that Dr. Holland's assistant ordered drugs for the clinic. *See* Tr. at 296, 334. She maintained that she had not heard anything about the returned drugs at issue until the day of the hearing. *Id*. The Deputy Administrator ignored both Dr. Morall's testimony and the ALJ's decision to credit it in finding that Dr. Morall "made false statements regarding the transfer of drugs."

The Deputy Administrator also ignored the ALJ's conclusion that Dr. Morall "appeared to regret her past conduct and . . . is unlikely to repeat it," a finding that clearly implicates credibility. *See ALJ Decision* at 20.

Although DEA is the ultimate fact finder, the agency's decision is vulnerable when it does not take the ALJ's findings into consideration. The reviewing court "must take the ALJ's findings into account as part of the record[;] . . . the significance to be ascribed to them 'depends largely on the importance of credibility in the particular case.'" *Reckitt & Colman, Ltd. v. Adm'r, DEA*, 788 F.2d 22, 26-27 (D.C. Cir. 1986) (quoting *Universal Camera Corp.*, 340 U.S. at 496-97). Obviously, credibility is central to the Deputy Administrator's analysis here. DEA provides no reason for ignoring the ALJ's decision to credit critical portions of Dr. Morall's testimony or the ALJ's conclusion that Dr. Morall regretted her actions and was unlikely to repeat them. Indeed, it does not so much as acknowledge evidence that the ALJ found determinative. The Deputy Administrator's failure to consider findings of the ALJ, which get at the heart of Dr. Morall's credibility, fortifies our conclusion that DEA's decision does not survive substantial

evidence review. *See E. Tenn. Natural Gas Co. v. FERC*, 953 F.2d 675, 681 (D.C. Cir. 1992) (per curiam) ("Because the ALJ relied on substantial evidence in the record, coupled with a well-reasoned and highly sensible analysis, in reaching [its] conclusion . . . , we can find no basis upon which to accept the [agency's] unsupported and ill-reasoned conclusion to the contrary.").

The DEA's decision is disturbing for another reason. Although the Deputy Administrator "[did] not necessarily find that [the unaccounted-for] controlled substances were diverted," she "[n]evertheless" concluded that "the lack of proper documentation to account for the shortage of large quantities of drugs; [Dr. Morall's] admission to the use of phentermine; her demonstrated lack of candor; empty drug vials around her home of which she was unable to account for their origins or disposition, all suggest possible drug use on [Dr. Morall's] part, or by someone close to her." 69 Fed. Reg. at 59,960. In other words, while the Deputy Administrator acknowledged that the record *does not* support a finding of diversion, she insinuated that Dr. Morall or someone close to her was abusing drugs.

In light of the record evidence presented in this case, the DEA's suggestion of "possible drug use" by Dr. Morall is both irresponsible and appalling. The suggestion is dangerously arbitrary and entirely unsupported. And it unnecessarily damns Dr. Morall, who was viewed by her colleagues to be "an exceptionally competent and compassionate psychiatrist," Aff. of Holly Greenfield, M.D. at 2-3, and someone with "very high" ethical standards. Tr. at 251 (testimony of Dr. Teich).

The record contains absolutely no evidence that Dr. Morall, her family, or anybody else abused drugs. Indeed, the ALJ found that § 823(f)(5) weighed in Dr. Morall's favor, because "[t]he record does not establish that [Dr. Morall] has engaged in any other conduct that may threaten the public health or safety," *ALJ Decision* at 19, and concluded that "the record does not

establish that [Dr. Morall] diverted any controlled substances," *id*. at 20. Dr. Morall testified that she did not abuse or divert controlled substances, and testimony by Dr. Teich and Dr. Greenfield corroborated her position. *See* Tr. at 292, 422-23 (testimony of Dr. Morall); Tr. at 252-53 (testimony of Dr. Teich); Aff. of Holly Greenfield, M.D. at 3. Even Investigator Barnhill – the Government's sole witness – conceded that she was aware of no reports of diversion or abuse and no evidence that Dr. Morall ever abused drugs or prescribed them for an illegitimate purpose. Tr. at 79, 159, 198-99, 223. The Deputy Administrator failed to consider *any* of this evidence before making the unsupported and profoundly stigmatizing insinuation that Dr. Morall abused drugs or diverted them to someone close to her.

No one doubts that Dr. Morall kept poor records and that her work and living environs were a mess during an unusually stressful time in her life. It is not at all clear, however, that the unaccounted-for dosage units constitute anything other than a manifestation of the poor record keeping, *i.e.*, the failure to document when patients were provided with what dosages. Indeed, the record contains evidence – evidence entirely omitted in the Deputy Administrator's decision – that the missing dosages could have been accounted for if Dr. Morall's patients had been contacted, and Investigator Barnhill admitted that the investigators spoke with only one patient, who did not deny that he was a patient of Dr. Morall's who received medication from her. *See* Tr. at 181-82, 207-08. Dr. Morall's admitted use of phentermine, meanwhile, related to a prescribed amount of the medication that she tried as a possible treatment for weight gain related to a serious medical condition. *See* Tr. at 343.

In short, the profoundly stigmatizing suggestion that Dr. Morall or a member of her family abused drugs simply is not sustainable on the record before us. *See Humphreys*, 96 F.3d at 665-66 ("The Deputy Administrator's inferences of a threat of

public harm are overly broad and only weakly, if at all, supported by the present record. Indeed, the Deputy Administrator admitted that no such diversion in fact occurred. The conclusion that substantial risk for diversion existed . . . , under these circumstances, is so unlikely as to be unsustainable."). What is particularly troubling here is that DEA's suggestion of possible drug abuse by Dr. Morall is offered for no apparent reason other than to disparage Dr. Morall. The conclusion of DEA's decision makes it clear that the agency's action against Dr. Morall rests solely on her record-keeping failures and her alleged lying to investigators, and the decision to impose the harshest of possible sanctions rests on the alleged lies alone. The decision does *not* purport to rest on diversion of controlled substances or drug abuse. Therefore, the Deputy Administrator's passing comment on possible drug abuse is gratuitous and condemnable.

In light of the foregoing, we hold that DEA's decision to revoke Dr. Morall's registration cannot withstand substantial evidence review. The agency's decision fails to consider relevant contradictory evidence, including evidence that led the ALJ to contrary findings of fact and credibility. And it inappropriately insinuates that Dr. Morall or someone in her family may have abused drugs when there is not a shred of evidence to support this suggestion. In sum, DEA's decision is arbitrary and capricious and therefore cannot stand.

## C. *The Revocation Penalty*

Even if the agency's decision were sufficiently supported, the penalty imposed – which is the harshest of possible sanctions – would be unwarranted by law. *See Bluestone Energy Design, Inc. v. FERC*, 74 F.3d 1288, 1294 (D.C. Cir. 1996) (agency's "choice of a sanction" will be upheld "unless the sanction is either 'unwarranted in law or . . . without justification in fact.'" (quoting *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182,

185-86 (1973) (ellipsis in original and internal quotation marks omitted))).

DEA offered no explanation for its decision to revoke Dr. Morall's registration while declining to revoke the registration of any other physician in a comparable context, or even under significantly more troubling circumstances. The decision to revoke Dr. Morall's registration, therefore, constitutes such arbitrary decisionmaking that it cannot withstand the most deferential of judicial review. *See Gulf Power Co. v. FERC*, 983 F.2d 1095, 1098-1100 (D.C. Cir. 1993) (holding "that the sanction the [agency] imposed was not rationally arrived at on this record and was wholly disproportionate to the error [petitioner] committed," where, *inter alia*, the agency "did not explain why it had not taken the same position . . . in similar circumstances in the past"). Indeed, an agency's need to explain contrary precedents "is particularly acute," as here, "when an agency is applying a multi-factor test through case-by-case adjudication." *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004).

Nowhere in its decision, in its brief to the court, or during the oral argument, did DEA identify a single case in which a physician's registration was revoked under analogous circumstances. The conduct at issue here does not come close to the acts in other cases in which DEA consistently declined to revoke the physician's DEA registration. For example, in *Theodore Neujahr, D.V.M., Continuation of Registration*, 65 Fed. Reg. 5680 (Feb. 4, 2000), DEA declined to revoke the registration of Dr. Neujahr, a veterinarian, despite findings that he had used his DEA certificate of registration to obtain controlled substances for his personal use, which he then abused; furnished false information to DEA; dispensed controlled substances for other than legitimate medical purposes; and failed to maintain adequate physical security of controlled substances. *See id.* at 5680-82. DEA decided to

continue Dr. Neujahr's registration even though he had initially told investigators who found Dexedrine in his care that "he was going to use the Dexedrine to treat obese dogs, but ultimately admitted that he had taken the Dexedrine himself." *Id.* at 5680. Investigators in Dr. Neujahr's case had also discovered that he had kept controlled substances in an unlocked drawer at both a registered and an unregistered location. *See id.* DEA determined that revocation was unwarranted, however, because of evidence that Dr. Neujahr had eventually sought help and been able to remain drug free, and because he was remorseful for his prior behavior. *See id.* at 5682.

Similarly, in *Karen A. Kruger, M.D., Grant of Restricted Registration*, 69 Fed. Reg. 7016 (Feb. 12, 2004), DEA declined to revoke the physician's registration even though she had unlawfully issued prescriptions over a one-year period resulting in the aggregate dispensing of approximately 5,500 dosage units of a particular controlled substance. *See id*. at 7016. Dr. Kruger had initially told a DEA investigator that, as an anesthesiologist, she rarely had occasion to prescribe, but had prescribed Tenuate to six-to-ten friends. She ultimately admitted to investigators, however, that she "had not prescribed to friends for about the last year, and instead, had issued prescriptions in fictitious names and then picked up the medications from the dispensing pharmacies" for her own use. *Id*. Dr. Kruger also admitted that "she telephoned bogus prescriptions to many . . . pharmacies in Chicago and its suburbs, using approximately forty different names, and that she took as many as 40 to 60 tablets per day," even though she acknowledged that the recommended dosage of Tenuate was only one tablet daily. *Id.* Dr. Kruger's Illinois Controlled Substance License was placed on probation for six months and the record contained only "scant" evidence of her recovery from a "long duration" of drug abuse. *Id.* at 7017.

Despite her initial assertion that she had prescribed Tenuate to friends rather than to herself, DEA found Dr. Kruger's "ready

willingness to cooperate with law enforcement authorities when questioned about allegations of her improperly prescribing" a significant consideration in her favor. *Id*. at 7017-18. DEA declined to revoke Dr. Kruger's registration, and merely restricted the registration to the authority to administer and prescribe controlled substances used in the practice of anesthesiology, removed Dr. Kruger's ability to prescribe for herself, and required that she submit to random drug testing for two years. *See id.* at 7018; *see also, e.g., Jeffrey Martin Ford, D.D.S., Grant of Restricted Registration*, 68 Fed. Reg. 10,750, 10,753 (Mar. 6, 2003) (granting limited registration despite "fairly extensive history of substance abuse" and "inconsistent and evasive testimony during the administrative hearing," because the Deputy Administrator concluded that the dentist was "now prepared to comply with laws regulating the use of controlled substances"); *Wesley G. Harline, M.D., Continuation of Registration with Restrictions*, 65 Fed. Reg. 5665, 5668 (Feb. 4, 2000) (continuing physician's registration despite, *inter alia*, Government's expert testimony that physician's record keeping was "grossly deficient"); *Paul W. Saxton, Continuation of Registration*, 64 Fed. Reg. 25,073, 25,078-79 (May 10, 1999) (declining to revoke physician's registration where, *inter alia*, physician prescribed anabolic steroids when it was illegal to do so and failed to maintain complete and accurate records of his controlled substance handling, which rendered him "unable to account for large quantities of drugs").

In support of its revocation of Dr. Morall's registration, DEA primarily relies on two cases, both of which arose in the context of sanctions for pharmacies (not physicians) and involved circumstances that differ from this case in critical respects. *RX Returns, Inc., Revocation of Registration*, 61 Fed. Reg. 37,081 (July 16, 1996), traced almost four years of ongoing discussions between a disposal company dealing with controlled substances and DEA. In 1992, a DEA inspection of RX Returns uncovered 17 violations that, among other things, prevented

DEA from completing an accountability audit and left controlled substances in unsecured and improperly stored conditions. *See id.* at 37,082. The result of this inspection, and subsequent meetings between DEA and the disposal company, was a memorandum of understanding between DEA and RX Returns in which the company agreed to correct all 17 cited violations and comply with applicable laws and regulations. The memorandum of understanding also memorialized the precise corrective actions that needed to be taken. *See id.* at 37,083.

DEA provided RX Returns with over a year to follow this corrective course and, in 1994, conducted a second inspection. Again, DEA uncovered numerous problems in processing, record keeping, and security systems. A third inspection, in 1995, once again revealed such violations. On the heels of three years of corrective instruction by DEA, investigators found Schedule II controlled substances in the company's premises, where the company lacked the authorization to handle such substances and had not even realized that such substances where in its possession. In addition, the continued failure to account for controlled substances rendered DEA unable to effectuate an accountability audit for a period of four years. *See id.* at 37,083-87. Even in light of this long history of second chances, DEA resolved to stay the revocation of RX Returns' registration and impose a one-year probationary period, finding that "it is in the public interest for [the company] to be given yet another opportunity to demonstrate" compliance with DEA's regulatory requirements. *Id*. at 37,090.

*Alexander Drug Company, Inc.*, *Revocation of Registration*, 66 Fed. Reg. 18,299 (April 6, 2001), the other case on which DEA relies, also pertained to continued noncompliance over a period of years and despite repeated inspections and interventions by DEA and the South Carolina Department of Health and Environmental Control. Moreover, the pharmacy had been convicted of a felony count of maintaining false

records regarding the dispensing of controlled substances. *See id.* at 18,299-304. In deciding to revoke the pharmacy's registration, the Administrator expressed particular concern with "the absence of evidence of remedial actions and the Respondent's demonstrated continued unwillingness or inability to comply with state and federal regulations." *Id*. at 18,304.

In contrast, Dr. Morall's record-keeping failures occurred during a relatively brief time period when, as the Deputy Administrator found, Dr. Morall was coping with her own health problems, her son's seizure and subsequent diagnosis, and the death of her father and of several friends. This was also the first time that Dr. Morall, who had almost no administrative assistance, was responsible for her own record keeping. Dr. Morall has always acknowledged that her record keeping suffered during this time, and she readily agreed to take classes to improve her record keeping in order to retain her registration. *See* Tr. at 331, 453-54.

In sum, on this record, the decision to revoke Dr. Morall's registration is a flagrant departure from DEA policy and practice. And, as the foregoing cases indicate, this policy and practice has been endorsed in a number of decisions rendered in recent years. Because the departure is not only unexplained, but entirely unrecognized in the Deputy Administrator's decision, the agency's sanction could not withstand abuse of discretion review even if the decision had been supported by substantial evidence. Although "mere unevenness in the application of [a] sanction does not render its application in a particular case 'unwarranted in law,'" *Butz,* 411 U.S. at 188, the agency's decision to revoke the registration in this case constitutes an unprecedented and unexplained departure from its consistent policy of declining to revoke a physician's DEA registration in a wide range of cases in which the record is comparable or significantly more troubling. *See Gulf Power Co.*, 983 F.2d at 1098-1100; *Wonsover v. SEC*, 205 F.3d 408, 413 (D.C. Cir.

2000) ("'The main point is that a court should not second-guess the judgment of the [agency] in connection with the imposition of sanctions, unless the [agency] has acted contrary to law, without basis in fact or in abuse of discretion.'" (quoting *Svalberg v. SEC*, 876 F.2d 181, 185 (D.C. Cir.1989))). We do not mean to suggest that no restrictions on Dr. Morall's registration might not have been appropriate, but only that revocation on this record and in light of DEA policy and practice is unwarranted.

### III. CONCLUSION

The agency's findings in this case do not survive substantial evidence review and the decision is arbitrary and capricious. Accordingly, we hereby grant the petition for review and vacate the revocation of Dr. Morall's registration. The case is remanded to the agency for a prompt disposition of this matter consistent with this opinion.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring in the judgment:

I agree with the majority's decision to remand to the Drug Enforcement Administration (DEA) but do so on the narrow ground that the DEA's review sequence in this case appears arbitrary and perhaps even retaliatory. Although the DEA elected not to challenge the ALJ's decision against revocation, Morall's license sat in limbo for over one year after the ALJ transmitted the record to the Deputy Administrator (DA) for review on July 14, 2003. It was only after Morall's counsel wrote a letter of complaint to the Department Of Justice Inspector General that the DA—in a matter of days—issued the final decision reversing the ALJ and revoking Morall's registration. While the timing may have been mere coincidence, the unexplained and lengthy delay and the rush to judgment following counsel's letter suggest the review process may have been irregular and therefore arbitrary in violation the Administrative Procedure Act. For this reason I believe remand to the DEA is necessary. That said, I believe the DA's substantive decision to revoke Morall's registration is supported by both precedent and substantial evidence and therefore could be sustained in a different procedural posture.

The notion that poor recordkeeping may of itself warrant revoking a controlled substance registration, noted by the DA and rejected by the majority, is neither new nor peculiar to this case. As the DEA observed in *Alexander Drug Co.*, 66 Fed. Reg. 18,299 (DEA 2001), "[p]ast DEA cases consistently have held that the failure to comply with record keeping requirements is a basis for revoking a registration." 66 Fed. Reg. at 18,303 (citing *Singers-Andreini Pharm., Inc.*, 63 Fed. Reg. 4,668 (DEA 1998); *Arthur Sklar, d/b/a*

*King Pharm.*, 54 Fed. Reg. 34623 (DEA 1989); *Summer Grove Pharm.*, 54 Fed. Reg. 28,522 (DEA 1989); *Boro Pharm. and Bell Apothecary*, 53 Fed. Reg. 15151 (DEA 1988)); *see also id*. at 18,304 ("[P]ast DEA cases have found record keeping violations to be a basis for the revocation of a registration based on the public interest." (citing *Summer Grove Pharm.*, *supra*). In fact, the government has pointed to two cases in which registration has been revoked on this basis. In *Alexander Drug*, the DEA revoked a pharmacy's registration because a "persistent pattern of non-compliance [with applicable record keeping regulations], taken together with [the owner's] failure to testify as to corrective actions taken to prevent future record keeping violations, create an unacceptable risk for the public interest." 66 Fed. Reg. at 18,304. In *RX Returns*, 61 Fed. Reg. 37,081 (DEA 1996), the DEA concluded that revoking the registration of a controlled substance disposal company was in the public interest because the company failed to maintain "effective controls against diversion," noting that its first biennial inventory failed to account for 500 controlled substances, the DEA investigator was unable during an inspection to reconcile records with drugs on hand and the company had unsecured schedule II substances on the premises.[1] The facts here do not of course mirror those in previous revocation cases but the flagrant recordkeeping violations the DEA found in this case (including failure to secure controlled substances) are likewise serious enough to justify

---

[1]The DEA nonetheless stayed the revocation because the disposal company was engaged in a new industry to which no DEA regulations specifically applied and it had worked with the DEA to address the absence of such regulations.

revocation. And, in any event, the DA reasonably found significant misconduct on Morall's part beyond her recordkeeping errors, as will be discussed below.

The DA applied the six-factor test set out in 21 U.S.C. 823(f), *see* maj. op. at _[15], and concluded that continuation of Morall's controlled substance registration was inconsistent with the public interest under factors two, four and five.[2] The DA first determined that factors two and five (experience in dispensing controlled substances and compliance with applicable state and federal law) weighed strongly in favor of revocation because Morall had committed "numerous violations of the Controlled Substances Act by failing to adhere to proper record-keeping," most notably in failing to keep accurate records of, or to secure, her drug inventories. These findings are unassailable and largely undisputed. *See* Tr. at 231 (Morall characterizing her recordkeeping as "[a]bysmal" and "horrible"); ALJ Op at 20 (Morall's violations were "egregious"); ALJ Op. at 7-8 (noting during December 1, 1998 inspection of Morall's residence DEA investigators found "open bottles of Meridia and phentermine as well as loose pills, candy wrappers, and other trash" in box on closet floor); *id*. at 9-10 (noting during January 5, 1999 inspection investigators found same

---

[2]As the DEA has repeatedly stated, the statutory factors "are considered in the disjunctive; the Deputy Administrator may rely on any one or a combination of factors and may give each factor the weight she deems appropriate in determining whether a registration should be revoked or an application for registration denied." Robert A. Smith, M.D., 70 Fed. Reg. 33,207, 33,208 (citing *Henry J. Schwartz, Jr., M.D.*, 54 Fed. Reg. 16,422 (DEA 1989)); *see also* maj. op. at __[15]

drugs stored in unlocked cabinet in closet). As a consequence of Morall's utter disregard for tracking her controlled substances, the DEA's final audit revealed that of the substances she handled from November 25, 1997 to January 5, 1999, at least 7,154 dosage units remained unaccounted for.

The DA also found that the fourth statutory factor (conduct which may threaten the public health and safety) supported revocation because of "the numerous occasions that [Morall] provided false information to DEA investigators and repeatedly frustrated their attempts to conduct their investigation." DEA Dec. at 19. The DA found that such "false and misleading statements . . . cannot be excused" because the DEA "cannot maintain the integrity of its regulatory system if its registrants, when asked to provide information required by law, provide false information." *Id*. Noting that at the hearing Morall denied intending to mislead the investigators or making false statements, the DA concluded that Morall "ha[d] no credibility, because it is absolutely clear that she lied to the investigators on numerous occasions." DEA Dec. at 17. Specifically, the DA found that Morall "lied about possessing controlled substances at her house," "having a safe in her house in which to store controlled substances," "treating patients from her home," and "the true identity of a friend for whom she had written prescriptions for controlled substances." DEA Dec. at 17. The DA further found that Morall "misled the investigators about the existence of patient records" because she "continually maintained that she had controlled substance records at her office, when in truth she did not," "later admitted that she had tried to create the records from memory" and "made

false statements regarding the transfer of drugs." *Id*. Finally, the DA found Morall "refus[ed] to cooperate with the DEA investigators," forcing them to obtain administrative inspection warrants for both her residence and her Steele Street office, and "agreed to assist DEA investigators in their inspection of the Steele Street location, without telling them that she had been evicted from that location." *Id*.

While acknowledging that Morall was not "forthcoming," the majority rejects the DA's findings that she was not credible and that she intentionally misled the investigators because, it contends, the DA "*entirely ignored* relevant evidence." maj. op. at 23 (emphasis in original), namely Morall's "extensive testimony pertaining to each of these disputed facts," maj. op. at __ [24]. First, it is clear from the DA's decision that she did not ignore Morall's contrary testimony—she simply did not believe it. *See* DA Dec. at 17 (noting at hearing Morall "claimed that she had never meant to mislead the investigators and denied making false statements" but finding Morall "has no credibility"). In any event, the cited testimony is not compellingly "relevant" to the DA's findings . The majority points to two specific portions of Morall's hearing testimony. On the one hand, it cites Morall's testimony that Dr. Holland, not Morall, had ordered the drugs that were returned to the supplier and that she was unaware of the return until the hearing—this notwithstanding the supplier's computer printout showed the pharmaceuticals had been purchased by Morall while employed at the Holland's clinic and returned by her (under her registration number) on May 1, 1998, months after Holland's clinic closed. *See* Tr. 333-34. The majority also points to Morall's hairsplitting statement "I *took care of*

patients *from* my home but I didn't actually *see* patients *at* my home," Tr. 351 (emphasis added) (which the majority apparently, and curiously, interprets as contradicting the DA's statement that Morall had lied about not "treating patients from her home"). Examples of such elaborate parsing are peppered throughout Morall's hearing testimony. She also testified, for example, that she had not told DEA registration technician Garcia she had a "safe" in her home but rather a "safe place" to store drugs, Tr. 354 (by which she apparently meant a cluttered box on her closet floor, *see* ALJ Op. at 8); that when she told DEA Investigator Barnhill she had not dispensed drugs since December 1, 1998, she had actually said "I did not dispense from Steele Street," Tr. 372; and that when she left a voicemail for Barnhill saying the drug records were "in the mail," she was "on [her] way to the post office" but then changed her mind about mailing them before reaching her destination,[3] Tr. 369-70. The DA's failure to specifically cite these snippets is unremarkable given that she expressly discredited Morall's testimony. Nor is it surprising the DA did not directly assail the ALJ's bare finding that Morall was credible, *see* maj. op. at __[24-25], which finding was apparently based on the same equivocations in her testimony. *See* ALJ Op. at 18.[4]

---

[3]In the end, of course, it turned out there were few if any such "records" to mail (only evolving reconstructions), notwithstanding Morall's initial statement to the DEA that they were located at her Steele Street office. *See* ALJ Op. at 8, 9.

[4]I do not understand how the ALJ's determination that Morall "appeared to regret her past conduct" "implicates credibility" as the majority posits. Maj. op. at __[25].

In sum, the DA's decision is supported by the record. The majority acknowledges that the DEA (represented here by the DA) "is the ultimate fact-finder." Maj. op. at __[25]. As such, the DEA "is not required to adopt the credibility determinations of an administrative law judge" and is not bound by the ALJ's findings even if they "rested on his evaluation of the credibility of the witnesses." *Kay v. FCC,*. 396 F.3d 1184, 1189 (D.C. Cir. 2005) (citing *FCC v. Allentown Broad. Corp.,* 349 U.S. 358, 363-64 (1955)). Accordingly, "the question for the reviewing court remains the same whether the agency agrees or disagrees with the ALJ—is the agency's decision supported by substantial evidence." *Id.* In this case the DEA's final findings regarding Morall's credibility both during the DEA investigation and subsequently at the DEA hearing are supported by ample evidence, notwithstanding Morall herself may have challenged such evidence in her own testimony.

Finally, I would note that the majority's lengthy discussion of the DA's remarks regarding the possibility of diversion or abuse is a red herring. As the majority acknowledges, the DEA's revocation decision "rests solely on her record-keeping failures and her alleged lying to investigators" and "does not purport to rest on diversion of controlled substances or drug abuse." Maj. op. at _ [28]. Thus, I do not see how the DA's remarks can make the unrelated decision to revoke Morall's registration arbitrary and capricious.

For the foregoing reasons I concur only in the majority's disposition—remanding to the DEA to reconsider its sanction. I do not agree with the majority's suggestion that

as a matter of law and fact revocation cannot be re-imposed on remand.